# Constitutionality of Regulatory Reform Legislation for Independent Agencies

Although there is no constitutional impediment to the bill's requirement that independent regulatory agencies communicate their legislative and budgetary messages directly to the Congress without first clearing them with OMB, a uniform rule in the opposite extreme—i.e., that *no* communication from an independent agency may be sent to OMB unless it is simultaneously sent to the Congress— would not adequately protect important interests of the Executive Branch. The congressional access provisions of the bill would not affect the power of the President, or the agency acting on the President's behalf, to assert executive privilege, because in the absence of express language in the bill, it must be assumed that the bill does not constitute an attempted infringement of the constitutionally based privilege, which is available with respect to those functions of independent regulatory agencies that are of an executive or quasi-executive nature.

September 1, 1976

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGISLATIVE AFFAIRS

This is in response to the request by Tom Boyd for the views of the Office of Legal Counsel on the Interim Regulatory Reform Act of 1976, S. 3308, 94th Cong., as it passed the Senate on May 19, 1976. 122 Cong. Rec. 14,528–34 (1976).

Our June 9 memorandum to you discussed the bill as it was introduced, when it merely would have required agencies to submit proposals for the recodification of their existing regulations. This proposal is retained in section 4 of the bill, modified and improved somewhat. However, the bill now also deals with such additional matters as substantive law revision for the seven independent agencies involved,[1] timely consideration of rulemaking petitions, congressional access to agency information, conduct of the agencies' civil litigation, protection of agency personnel, conflicts of interest, and a limited waiver of sovereign immunity. Each of these provisions, except that dealing with substantive law revision, is patterned after a virtually identical section of a law already in effect for one or another of the agencies. The effect of S. 3308 is therefore to extend these provisions to the seven agencies involved so that all will be on equal footing. We will discuss the proposals in order.[2]

---

[1] As introduced, S. 3308 applied to the Departments of Commerce and Transportation, Civil Aeronautics Board ("CAB"), Interstate Commerce Commission ("ICC"), Federal Trade Commission ("FTC"), Federal Communications Commission ("FCC"), Federal Maritime Commission ("FMC"), and Consumer Product Safety Commission ("CPSC"). *Id.* § 3 (as introduced Apr. 13, 1976). The two departments have now been dropped from the bill and the Federal Power Commission ("FPC") has been added. *Id.* (as amended May 19, 1976); 122 Cong. Rec. 14,528.

[2] Rules recodification, law revision, and protection of agency personnel are dealt with in sections 4, 5, and 9, respectively. Each of the remaining provisions listed in the text is the subject of a separate section of the bill. However these sections (6, 7, 8, 10, and 11) apply only to the FTC, FCC, FPC, and

## I. Rules Recodification

This section (§ 4) applies to all seven agencies. It would require the chairman of each agency, within 360 days after the Act is passed, to prepare and submit to the Congress and to the Administrative Conference of the United States an initial proposal setting forth a recodification of all the rules which the agency has issued and which are in effect or proposed as of the date of submission. S. 3308, § 4(a). The recodification is to be only "technical"—i.e., a streamlining or simplification of existing rules to make them more understandable and capable of effective and fair enforcement. The bill expressly provides that the recodified rules "shall not be at variance, in any substantive respect, with the text of the rules of the agency involved which are in effect or proposed as of the date of such submission." *Id. See also* S. Rep. No. 94-838, at 2–3 (1976) ("Senate Report"). After studying the comments and recommendations of the Administrative Conference and others, the chairman of each agency must submit to the Congress a final proposal for recodification of the agency's rules, which will take effect 90 days after this final submission. S. 3308, § 4(c). The provisions for judicial review in chapter 7 of title 5, United States Code, are expressly made applicable to the repromulgated rules. S. 3308, § 4(e).

Although section 4 as it passed the Senate does not contain several of the defects we identified in the original version of S. 3308, we still have reservations about it:

The term "rule" is defined in section 4(f) of the bill in language that to some extent parallels the definition of the term in 5 U.S.C. § 551(4) (Supp. V 1975). However, the term also includes "any general statement of policy, and any determination, directive, authorization, requirement, designation, or similar such action," but not an "order" as defined in 5 U.S.C. § 551(6) (1970). The express exclusion of "orders" from the definition is unnecessary, and it is not clear what is covered by the additional phrase just quoted.

Moreover, the definition of the term "rule" encompasses many agency determinations—such as "the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor, or valuation, costs, or accounting"—which affect a limited number of parties and are not ordinarily codified in the Code of Federal Regulations. Yet sections 4(a) and 4(c) require the agency to prepare initial and final proposals "setting forth a recodification of *all* of the rules which such agency has issued and which are in effect or proposed" (emphasis added). Perhaps this means that the agencies must review and repromulgate only

---

CPSC. Sections 12–14 each deal with one of the three other agencies, so that all remaining matters affecting the CAB, ICC, or FMC are included in one section. The substance of the proposals as to each of the three is largely the same as that set forth in the earlier sections. The CAB, ICC, and FMC were separated out because they are not subject to the jurisdiction of the House Commerce Committee.

those rules which have already been codified. It would be advisable to make this qualification explicit, however, or at least to limit the definition of the term "rule" in section 4(f) to matters of general applicability.[3] In our view, the Department should not endorse any proposal which would require the agencies to reexamine and codify all previously promulgated rules of particular applicability.

The bill directs the chairman of each independent agency to "develop, prepare, and submit" the initial and final proposal for the technical recodification of the agency's rules. S. 3308, § 4(a), (c). However, because the proposals will contain revisions of the agency's governing rules, which must ordinarily be approved by a vote of all the members of the commission or board, we assume that the chairman is to submit the agency's proposals only after they have been approved by the commission or board.

Section 4(e) provides that the text of the initial and final proposals must be published in the Federal Register and that written comments are to be invited on them. Solicitation of comments makes sense with respect to the initial plan, which is in the nature of a notice of proposed rulemaking, but we see no reason to provide another opportunity for public comment on the final proposal.

We also question the advisability of the provision for judicial review in section 4(e). Presumably there was an opportunity for judicial review of the substantive content of the agency's existing rules when they were first promulgated. Because the recodification is to be only technical, judicial review of the substance of the new rules is unnecessary. Furthermore, a court has no particular expertise to determine whether an agency should have gone further in simplifying and consolidating its rules. That is essentially a legislative-type determination to be made by the agency and the Congress. And if there were any question as to whether a given change was in fact merely technical, a court in a later case would no doubt construe and apply the new rule in such a way that it would not be at variance in any substantive respect with its predecessor. Judicial review of the recodified rules will therefore serve no legitimate purpose, and it could lead to delay and confusion as to the force of the recodified rules pending review.

Finally, we doubt whether the possible benefits of simplification of agency rules—assuming they materialize—will outweigh the costs involved in the recodification process. Agency personnel and those subject to the agency's jurisdiction are familiar with the regulations as they are presently written and codified. The transition period will introduce considerable uncertainty. It is also possible that the proposed "technical" recodification will divert attention from the more profound assessment of the agency's functions contemplated in section 5 of

---

[3] In this connection, we note that section 1 of S. 796, 94th Cong. (as introduced Feb. 22, 1975), which is based on recommendations of the American Bar Association ("ABA") and the Administrative Conference, would exclude matters of particular applicability from the definition of "rule" under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and include them in the definition of a new term, "rate-making and cognate proceedings."

S. 3308. In fact, major portions of the recodification could be rendered moot by the substantive law revision, if it is adopted. However, the ultimate wisdom of section 4 involves questions of policy on which this office defers to the seven agencies involved.

## II. Law Revision

Each of the seven agencies is directed by section 5(a) of S. 3308 to conduct a full review of the statutory and case law relating to the agency and to make recommendations to the Congress for revision and codification of the statutes and other lawful authorities administered by or applicable to it, including repeals or amendments "as such agency feels may better serve to enhance commerce and protect consumers." The purpose of the study and recommendations is to facilitate congressional consideration of regulatory reform and to clarify, simplify, and improve applicable law, both substantively and technically.

The chairman, upon the approval of a majority of the members, would appoint a director to supervise the agency's law revision activities and to serve as the agency's reporter, S. 3308, § 5(b), and he would also appoint an Advisory Committee on Law Revision comprised of "individuals who by reason of knowledge, experience, or training are especially qualified to assist in such law revision," *id.* § 5(c). Section 5(e) requires the chairman to submit a preliminary report on law revision to the President and Congress within one year after the bill is passed and an interim and final report within two and three years of passage, respectively. The latter two reports would include an analysis of the economic and other consequences of the revision and codification and a discussion of alternatives considered.[4]

It is somewhat dubious that proposals for regulatory reform will be made in an objective and thorough manner when they are developed under the control of the very agencies sought to be reformed. For example, none of the agencies would be likely to propose that it cede jurisdiction in certain matters to another body, or that Congress provide for deregulation in a sector of the economy which would result in a significant diminution of the agency's role. Also, S. 3308 does not contemplate reports from or about other agencies or executive departments whose functions are related to those of the seven dealt with in the bill and which would therefore be affected by the substantive law revision. By way of contrast, S. 3428, 94th Cong. (as introduced May 13, 1976), an administration bill, would require the President to submit regulatory reform proposals to the Congress which cut across agency and departmental lines and cover entire sectors of the economy, such as

---

[4] A similar but less elaborate law revision requirement is currently applicable to the ICC by virtue of section 312 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31, 60 ("RRRRA"). *See* Senate Report at 82–83. This provision would be repealed by section 13(a) of S. 3308.

transportation, agriculture, mining, manufacturing, finance, and communications. However, whether or not this broad ranging approach is preferable to the more compartmentalized study called for in S. 3308 involves questions of policy on which this office takes no position.

We do have one technical suggestion, however. It may be desirable to include in section 5(c) an authorization for compensation for the members of the Advisory Committees.

### III. Timely Consideration of Petitions

Sections 6, 12(a) and 14(a) of S. 3308 would amend the organic acts of the FTC, FCC, FPC, CAB, and FMC[5] to require these agencies to grant or deny petitions filed under 5 U.S.C. § 553(e) (1970) within 120 days and to publish the reasons for each denial in the Federal Register. If the agency denies the petition or fails to act on it within 120 days, the petitioner would be entitled to bring a civil action for an order directing the agency to initiate a proceeding to take the action requested in the petition. To obtain such an order, however, the petitioner would be required to demonstrate (by a preponderance of the evidence in the record before the agency, or, if the agency had failed to act, in a "new proceeding" before the court) that the failure to grant the petition was arbitrary and capricious, that the action requested in the petition is necessary, and that the failure to take the action requested in the petition "will result in the continuation of practices which are not consistent with or in accordance with" the agency's organic act or any other act administered by the agency or applicable to it. However, a court would have no authority to compel the agency to take any action other than the initiation of a proceeding for the issuance, amendment, or repeal of an order, rule, or regulation.

Somewhat similar provisions are already in effect for the CPSC, *see* 15 U.S.C. § 2059 (Supp. V 1975), and for the ICC with respect to common carriers by railroad, *see* 49 U.S.C. § 13(6) (as added by RRRRA, *supra* note 4, § 304(b), 90 Stat. at 52). S. 3308 therefore contains no new provision regarding rulemaking petitions filed with the CPSC, and section 13(b) merely extends to all ICC matters the provisions for the timely consideration of petitions that are now applicable only to those involving common carriers by railroad.

The Administrative Procedure Act ("APA"), 5 U.S.C. § 553(e), now provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." By letter dated April 26, 1976, from Assistant Attorney General Uhlmann to Senator Eastland, the Department opposed the enactment of S. 3123, 94th Cong. (as introduced Mar. 10, 1976), which would have amended 5 U.S.C. § 553(e) to provide that an agency must either deny such a petition or initiate the requested rulemaking proceeding within 60 days of the

---

[5] In the case of the FMC, "organic act" refers to Reorganization Plan 7 of 1961, 75 Stat. 840.

receipt of the petition. It was pointed out in the letter that 5 U.S.C. § 555(b) and (e) (1970) already impose an obligation on agencies to act on such petitions in a reasonable time and that a person aggrieved by an agency's delay in acting on a petition would appear to have a right to seek judicial review under 5 U.S.C. § 706(1) (1970) to compel the agency to decide whether to deny the petition or initiate rulemaking. The court cannot now, and could not under S. 3123, address the merits of the petition or direct the agency to initiate the requested rulemaking proceeding.

S. 3308 is in certain limited respects an improvement over S. 3123, because it would allow the agencies 120 rather than 60 days to take action on petitions, S. 3308 §§ 6, 12(a), 14(a), and because it would not amend 5 U.S.C. § 553(e) and thereby impose a rigid deadline on *all* departments and agencies covered by the APA. Moreover, only the person who files the petition could seek judicial review of the agency's denial or failure to act on his petition. The generally applicable judicial review section of the APA (5 U.S.C. § 702 (1970)), on the other hand, allows any person suffering legal wrong because of agency action or adversely affected or aggrieved within the meaning of a relevant statute to seek judicial review. Nevertheless, there may still be some question as to whether a fixed deadline is appropriate. The FPC, FCC, CAB and FMC opposed the provision in their letters to the Senate Commerce Committee regarding S. 3308. *See* Senate Report at 65, 67, 71, 78.

Whatever may be the merits of the fixed deadline provided for in S. 3308, however, we recommend that the Department oppose the bill's judicial review provisions. The bill would require a court to determine whether the action requested in a petition is "necessary" and whether the agency's failure to take the action will result in the continuation of practices which are not consistent with the agency's responsibilities. *Id.* §§ 6(a)(1), 6(b), 6(c), 12(a), 14(a). These are substantive determinations of a kind ordinarily reserved to the agency. Yet, having made a decision which is tantamount to a decision on the merits of the petition, a court could do no more than remand the matter to the agency for another exploration of the same issues in rulemaking proceedings. Notwithstanding the statement in the Senate Report that the bill does not make "administrative expertise subservient to the orders of the judiciary," *id.* at 5, it is our opinion that this judicial review procedure would seriously undermine the independence of the agencies involved. An agency would be most reluctant to refuse to take the action requested in a petition after a reviewing court has already determined that such action is "necessary" and that the failure to take the action is not consistent with the agency's goals. As a result, judicial review, which would frequently be made on an incomplete record and without the benefit of the agency's expertise, would give the appearance of pre-judging the merits of the petition for the agency and thereby casting doubt on the integrity of subsequent agency proceedings.

Quite aside from public pressures and problems of appearances resulting from the timing of judicial review, the bill has the added disadvantage of forcing a court

to second-guess the agency on the allocation of its scarce resources among various administrative proceedings and other agency functions. As a practical matter, the reviewing court might also be forced to consider each petition in isolation, without giving due regard to related proceedings or the agency's long-term goals.

The provisions for the timely consideration of petitions in S. 3308 were patterned after 15 U.S.C. § 2059, *see* Senate Report at 4, which permits a district court to order the CPSC to initiate rulemaking proceedings if the petitioner can demonstrate to the court that the consumer product involved "presents an unreasonable risk of injury" and that the failure of the CPSC to initiate rulemaking proceedings "unreasonably exposes the petitioner or other consumers to a risk of injury presented by the consumer product," 15 U.S.C. § 2059(e)(2). It may be questioned whether a court should second-guess the CPSC on such a matter, but at least a court's intervention is limited to situations which pose a significant threat of injury. In such cases, the interference with the independent judgment of the CPSC may be thought to be out-weighed by an overriding public interest in safety. An overriding public interest of this type is not present in most matters coming before the other agencies covered by S. 3308. Thus, the CPSC provision is not necessarily a precedent for the present bill.

It might be argued, of course, that the independence of the agencies is preserved in S. 3308 by the added requirement that a court may not direct an agency to commence rulemaking proceedings unless it concludes that the agency acted arbitrarily and capriciously in denying the petition or failing to act on it. We doubt that this will be the effect. If the court determines that the action requested in the petition is necessary and that the failure to take the action would not be consistent with the act administered by the agency, the court would be hard-pressed to conclude that the agency's denial or failure to act was nevertheless not arbitrary and capricious.

Finally, we have some questions about the evidence on which the reviewing court must base its decision. The relevant sections of the bill provide that the decision is to be based on "a preponderance of the evidence in the record before the [agency] or, in an action based on a petition on which the [agency] failed to act, in a new proceeding before such court." S. 3308, §§ 6, 12(a), 14(a). There is now no requirement in the APA that a decision whether to grant or deny a petition be made on the basis of a record developed before the agency and that an agency's denial be substantiated by such a record. This makes sense, because the agency's determination as to whether to initiate rulemaking proceedings depends not merely on the "facts" pertinent to the petition, but also on broader policy, budgetary, and related considerations which it would often be unnecessarily wasteful to reduce to writing in each case. The effect of S. 3308, then, would be to force the agency to go to the added expense of preparing an administrative record in a kind of mini-rulemaking proceeding so that its denial of a petition will be supported by the preponderance of the evidence in the record. Again, while this result might be

acceptable for the CPSC because of public safety considerations, there is far less justification for it with respect to the other agencies covered by the bill.

For these reasons, we believe that the provisions for judicial review raise far more problems than they would solve. In our view, judicial review of the type now available to compel an agency to make a decision whether to grant or deny a petition is as far as the bill should go in this area.

## IV. Congressional Access to Information

### A.

Sections 7, 12(a) and 14(a) of S. 3308 would have the effect of establishing a uniform requirement that the agencies transmit to the Congress copies of budget information, legislative recommendations, testimony for congressional hearings, and comments on legislation at the same time that such materials are submitted to the President or to the Office of Management and Budget ("OMB"). The sections further provide that no officer and no other agency of the United States shall have authority to require the agency to submit its legislative recommendations, testimony, or comments for approval, comments, or review prior to their submission to Congress. Provisions of this type are already applicable to the CPSC under 15 U.S.C. § 2076(k) (Supp. V 1975), enacted in 1972, and to the ICC by virtue of section 201(j) of the Budget and Accounting Act of 1921, 31 U.S.C. § 11(j) (as added by RRRRA, *supra* note 4, § 311, 90 Stat. at 60). A similar provision applicable to the FTC was also included in section 4 of S. 2935, as it passed the Senate on March 18, 1976. *See* 122 Cong. Rec. 7203 (1976); Senate Report at 5–6, 86.

Under existing law, the Secretary of the Treasury, the Director of OMB, and the heads of "executive agencies" (which in this context presumably includes independent regulatory agencies) must, upon request, furnish a committee of either House of Congress, the Comptroller General, or the Director of the Congressional Budget Office information as to the "location and nature of available fiscal, budgetary, and program-related data and information." 31 U.S.C. § 1153(a)(1) (Supp. V 1975). This provision would appear to require the head of a department or agency to furnish Congress with the budgetary proposal that the department or agency has transmitted to OMB, although this Department's administrative counsel has construed the provision to compel the furnishing of the Department's budgetary data to Congress only after OMB has completed the overall budget process. This is apparently OMB's position as well. *See* OMB Circular No. A-10, §§ 3–4. OMB Circular A-19 requires independent agencies to clear their legislative proposals through OMB, although section 7(g)(2) of the Circular permits such reports to be submitted without approval where time limits require.

Thus, the effect of S. 3308 would be to alter the time at which Congress could obtain copies of budget and legislative materials prepared by the seven independent agencies and to make them available to Congress without OMB clearance or a

formal request from the Congress. The bill would not lift the present requirement that agencies' budgetary and other materials be submitted to OMB as well. Thus, the Executive Branch will be informed of all agency transmissions to Congress and will be able to counter them through its own recommendations, testimony, and comments.

In general, we see no constitutional impediment to the requirement that independent regulatory agencies communicate their legislative and budgetary messages directly to the Congress without first clearing them with OMB. In *Humphrey's Executor v. United States*, 295 U.S. 602, 629–31 (1935), the Supreme Court held that Congress could establish a regulatory agency, in that case the FTC, and insure its independence from Executive Branch control by establishing a fixed term for its members and providing that such members could be removed only for inefficiency, neglect of duty, or malfeasance in office. In our view, Congress may legitimately conclude that a uniform practice of clearing all communications with Congress through OMB might undermine the agencies' intended independence from the Executive Branch. *See* Senate Report at 5–6.

On the other hand, a uniform rule in the opposite extreme—i.e., that *no* communication from an independent agency may be sent to OMB unless it is simultaneously sent to the Congress—would not adequately protect important interests of the Executive Branch. For example, we do not believe that independent agencies should be permitted to transmit to Congress copies of comments they have prepared on legislation or reports drafted by executive departments before the legislation or reports have themselves been transmitted to Congress. The departments' draft legislation and reports are subject to review by OMB prior to submission to Congress. This measure of Executive Branch control—which has constitutional underpinnings in the duty of the President to "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3—would be lost if copies of independent agency comments made available to Congress disclosed the substance of the Executive Branch proposals while the proposals were still in their formative stage. In our view, the same principle applies when draft legislation, reports, or comments prepared by an independent agency relate to other important interests of the Executive Branch, as might be the case, for example, with a proposal to take jurisdiction in a certain area away from an executive department or to alter the application of civil service laws to the agency's personnel.

## B.

The other feature of sections 7, 12, 13 and 14 of S. 3308 having to do with congressional access to agency information directs each agency, whenever a duly authorized committee having responsibility for authorizations or appropriations for the agency makes a written request for documents in the possession or subject to

the control of the agency, to submit such documents (or copies thereof) to the committee within 10 days of the request. The bill prescribes no sanctions for an agency's failure to comply, nor does it contain any other means of enforcement, although the bill does expressly provide that it "shall not be deemed to restrict any other authority of either House of Congress, or any committee or subcommittee thereof, to obtain documents," *id.* §§ 7(a), 7(b), 7(c), 7(d), 12(a), 14(a)— apparently referring to the subpoena power. A similar congressional access provision was recently made applicable to the ICC in a new paragraph 15 of section 17 of the Interstate Commerce Act, 49 U.S.C. § 17(15) (as added by RRRRA, *supra* note 4, § 301, 90 Stat. at 47). In our opinion, the Department of Justice should oppose the adoption of this aspect of S. 3308, because it does not adequately preserve the confidentiality of trade secrets and similar information obtained from persons subject to the agencies' regulation and because it could lead to inappropriate involvement by the Congress in the ongoing operation of the agencies, especially in pending cases and investigations.

Confidential information in the hands of an independent regulatory commission should be protected from casual disclosure in the course of compliance with a sweeping, undifferentiated, and perhaps passing congressional request for materials. *Cf. Authority of Federal Communications Commission to Disclose Confidential Information to Senate Committee on Interstate and Foreign Commerce*, 41 Op. Att'y Gen. 221, 228 (1955) (Brownell, A.G.). The provision applicable to the ICC recently enacted as section 17(15) of the Interstate Commerce Act contains a key limiting provision designed to enable agencies to afford just such protection, while at the same time preserving the right of a congressional committee to obtain the material by means of subpoena if it concludes that circumstances warrant disclosure. The limiting provision reads:

> This paragraph shall not apply to documents which have been obtained by the Commission from persons subject to regulation by the Commission, and which contain trade secrets or commercial or financial information of a privileged or confidential nature.

90 Stat. at 47. Similar qualifying language was apparently contained in the relevant paragraphs of S. 3308 when the bill was circulated to the seven agencies in working paper form, *see* Senate Report at 68, but it has since been deleted. Section 13(c)(5) of S. 3308 would delete the passage from the Interstate Commerce Act as well. At a minimum, this protection for confidential information should be restored to the bill.

Even with this modification, however, we have serious doubts about the disclosure provision. The Department of Justice has taken the position that executive privilege is available with respect to those functions of independent regulatory agencies that are of an executive or quasi-executive nature. The privilege must be assertible by the President or in a manner suitable to him. In our view, S. 3308

would not affect the power of the President, or the agency acting on the President's behalf, to assert executive privilege, because in the absence of express language in the bill, it must be assumed that the bill does not constitute an attempted infringement of the constitutionally based privilege. Nevertheless, the passage of these congressional access sections of S. 3308 could introduce added confusion into an already unsettled area.

Aside from the question of executive privilege as such, it should also be noted that within its own area of operations, an independent regulatory agency has a strong interest in the free flow of communications to and from the heads of the agency—i.e., the members of the commission or board—which is analogous to that giving rise to the privilege of the President as head of the Executive Branch. *See United States v. Nixon*, 418 U.S. 683, 705, 708 (1974). An independent regulatory agency also has a strong interest in the integrity of ongoing cases and investigations which could be seriously prejudiced if the facts and legal arguments are freely reported to the Congress. Similar interests have been asserted to support the withholding of investigation-related evidence compiled by the FBI, an agency of the Executive Branch. *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45 (1941) (Jackson, A.G.). In our view, S. 3308 does not give adequate weight to these important interests.

It is true that the bill contains no sanctions for violations and that an agency might therefore be thought to be free to decline to comply with a request for information on either of the above-mentioned grounds or for any other reason. But an agency should not be placed in the position of defying mandatory language in a statute in order to protect the confidentiality of certain of its internal communications and operations. For these reasons, we recommend that the Department oppose passage of those portions of sections 7, 12(a), 13(c), and 14(a) which purport to require agencies to furnish information to Congress within 10 days of a request.

## V. Representation in Litigation

Section 8, 12(a), 13(d) and 14(a) of S. 3308 contain provisions which would in essence permit the FCC, FPC, CAB, ICC, and FMC, through their own attorneys, to commence, defend, or intervene in any action (including any appeal of such action) having to do with matters under their jurisdiction if the Department of Justice fails to assume the case on behalf of the agency within 45 days of the receipt of written notification from the agency. The right of an agency to handle its own appeals in cases in which the Department of Justice has declined to represent the agency apparently would include appeals and petitions for certiorari to the Supreme Court, thereby undercutting the Solicitor General's control over such matters. The agencies would also be authorized to seek temporary and preliminary injunctive relief without first giving the Department of Justice an opportunity to take responsibility for the case.

Congress recently enacted somewhat similar legislation for the FTC, *see* 15 U.S.C. § 56(a) (Supp. V 1975), and the CPSC, *see* Consumer Product Safety Commission Improvements Act of 1976, Pub. L. No. 94-284, § 11, 90 Stat. 503, 507–08.[6] S. 3308 therefore contains no section dealing with the litigating authority of these two agencies.

The Department of Justice vigorously opposed the expansion of the FTC's litigating authority on the traditional ground that the government's litigation should be centrally controlled and under the supervision of experienced trial attorneys, *see* H.R. Rep. No. 93-1107, at 51–52, 67–68 (1974), and the Chief Justice informed the Congress that the justices unanimously recommended against dilution of the Solicitor General's control over government litigation in the Supreme Court, *see* S. Rep. No. 93-1408, at 39 (1974). Both objections were to no avail. The Department also unsuccessfully opposed the expansion of the CPSC's litigating authority. *See Consumer Product Safety Act Amendments: Hearings Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce*, 94th Cong. 158–67 (1975) (statement of Joe Sims, Special Assistant to the Assistant Attorney General, Antitrust Division).

We assume that the Department will also oppose S. 3308 to the extent that it would result in a loss of litigating authority to the other five agencies,[7] although

---

[6] The FTC provision is actually considerably broader than the litigating authorizations in S. 3308 for the FCC, FPC, CAB, and FMC, because it grants the FTC exclusive litigating authority in such areas as injunctive relief, consumer redress, judicial review of rules and cease and desist orders, and enforcement of subpoenas. 15 U.S.C. § 56(a)(2). Section 13(d) of S. 3308 would grant the ICC exclusive litigating authority in essentially the same areas as those in which the FTC has been granted such authority. This ICC provision is virtually identical to one passed by the Senate as part of the RRRRA but dropped from the bill (S. 2718) because of a jurisdictional objection by a House Committee. *See* S. Rep. No. 94-595, at 158–59 (1976) (Conf. Rep.). The Department of Justice apparently did not formally communicate with the Congress on this feature of the Senate version of S. 2718.

The CPSC provision enacted in May gives the CPSC exclusive litigating authority only in injunction and forfeiture actions, and it expressly denies the CPSC the authority to handle its own cases in the Supreme Court. It does, however, permit the CPSC, with the concurrence of the Attorney General, to prosecute and appeal any criminal action. S. 3308 does not propose to give the other six agencies any authority with respect to criminal cases.

[7] The existing litigating authority of the five agencies varies considerably. For example, the FPC currently has authority to be represented by its own attorneys in actions to review FPC orders or to enjoin violations of the Federal Power Act and Natural Gas Act. *See* 15 U.S.C. §§ 717r, 717s; 16 U.S.C. §§ 825*l*, 825m (1970). Section 8(b) of S. 3308 therefore appears to *enhance* the authority of the Department of Justice by giving the Attorney General 45 days in which to assume responsibility for such actions. *See* Senate Report at 65–66. Similarly, the FCC's right under 47 U.S.C. § 401(e) (as added by S. 3308, § 8(a)) to be represented by its own attorneys in appeals of FCC orders and decisions under 47 U.S.C. § 402(b) (1970), *see* Senate Report at 68–69, may be undercut by the Attorney General's right of first refusal under 47 U.S.C. § 402(e)(1)(B) (as added by S. 3308, § 8(a)). *See also* 49 U.S.C. § 1486(a) (1970) (CAB); 46 U.S.C. § 828 (1970) (FMC); Senate Report at 72–73 (CAB), 79 (FMC). In other respects, however, the litigating authority of these agencies would be enhanced insofar as actions the Attorney General has refused to bring are concerned. The somewhat different provisions in section 13(d) would apparently have little substantive effect on the ICC's present authority. Senate Report at 54–55.

that is a question of policy on which this office defers to the Solicitor General, the Civil Division, and other interested litigating divisions.

## VI. Protection of Officers

Section 9 of S. 3308 would amend 18 U.S.C. § 1114 (Supp. V 1975) to make it unlawful to kill an officer or employee of the ICC, FTC, FPC, FCC, CAB or FMC who is "assigned to perform investigative, inspection, or law enforcement functions, while engaged in the performance of his official duties, or on account of the performance of his official duties." Section 1114 now prohibits the killing of officers and employees of various executive departments and agencies and of the CPSC, which was brought under the section's coverage as a result of an amendment contained in section 18 of the Consumer Product Safety Commission Improvements Act, 90 Stat. at 514. Also, 18 U.S.C. § 111 (1970) makes it a federal crime forcibly to assault, resist, oppose, impede, intimidate or interfere with a person designated in 18 U.S.C. § 1114 while he is engaged in, or on account of, the performance of his official duties.

We do not disagree with the statement in the Senate Report (at page 8) that there should be no distinction, for purposes of federal criminal jurisdiction, between officers and employees of the Executive Branch and those of independent agencies, but we question whether piecemeal amendment to 18 U.S.C. §§ 111 and 1114 is the proper approach. This Department has previously sought more general amendment to those provisions bringing within federal jurisdictions all assaults on federal officers occasioned by their status or their performance of duties. This is the approach taken in S. 1, 94th Cong. (as introduced Jan. 15, 1975).

## VII. Avoidance of Conflict of Interest

The organic acts of each of the seven agencies would be amended by sections 10, 12(d), 13(f), and 14(b) of S. 3308 to provide that no commissioner or member shall, for a period of two years following the termination of his service as a commissioner or member, "represent any person before the [Commission or Board] in a professional capacity."[8] The prohibition is intended to prevent a conflict of interest or the appearance of a conflict of interest, Senate Report at 8, presumably resulting from the possibility that a former commissioner or member might have lingering influence with the agency by virtue of his former position.

---

[8] Section 14(b) would add a new section 102(e) to Reorganization Plan 7 of 1961 to prohibit a commissioner of the Federal Maritime Commission from engaging in any other business, vocation, profession, or employment. A similar prohibition is already in effect for members of the other six agencies, although only FCC commissioners are expressly precluded from engaging in any other "profession." 47 U.S.C. § 154(b) (1970). For the sake of uniformity, S. 3308 would add the word "profession" to the provisions applicable to the CPSC (§ 10(d)), FTC (§ 10(a)), CAB (§ 12(d)), ICC (§ 13(f)), and FPC (§ 10(c)). We have no objection to these changes.

Under existing law, a specific prohibition similar to this is in effect only for former FCC commissioners, although the FCC provision is applicable only for one year and only if the former commissioner did not serve the full term for which he was appointed. However, members and employees of all seven agencies covered by S. 3308 are subject to the criminal conflict of interest laws, including 18 U.S.C. § 207 (1970). Subsection (a) of section 207 bars a former officer or employee of an independent agency from knowingly acting as agent or attorney for anyone other than the United States, either before the agency or in court, in connection with any case or other particular matter in which he participated personally and substantially as such an officer or employee. In addition, subsection (b) prohibits a former officer or employee of an independent agency, for a period of one year following the termination of his service, from knowingly acting as agent or attorney for anyone other than the United States in connection with any particular matter which was under his "official responsibility" within one year prior to the termination of such responsibility. All matters pending within an independent agency are under the "official responsibility" of the commissioners or members. *See* 18 U.S.C. § 202(b) (1970). Thus, the effect of 18 U.S.C. § 207(b) is to prohibit, for a period of one year, a former commissioner or member of any of the agencies involved here from representing a private party in connection with any particular matter that was pending within the agency during the year prior to the time he left office, even if he had not participated in it or had no knowledge of it while he was in office.

The conflict of interest section of S. 3308 would supplement the existing ban on representational activity contained in 18 U.S.C. § 207. We recommend that the Department support this proposal. Former commissioners or members are free under 18 U.S.C. § 207 to represent private parties before the agency in which they previously served in new matters that arise in the agency after they leave. Yet the potential for a former commissioner or member to exert undue influence in an agency proceeding because of his prior position is just as great in new matters as in matters that were pending in the agency at the time he was there. S. 3308 would prevent the use of such influence.

S. 3308 would impose a two-year ban on representational activities rather than the one-year ban found in 18 U.S.C § 207. This longer period was chosen to make the conflict of interest section in S. 3308 consistent with 18 U.S.C. § 283,* which prohibits a retired officer of the Armed Forces of the United States, during the two years following his retirement, from acting as agent or attorney or otherwise

---

* Editor's Note: By the time of this opinion, 18 U.S.C. § 283 was listed in the U.S. Code as having been repealed. *See* 18 U.S.C. §§ 281–284, at 4185–86 (1970). As explained in the reporter's note to the 1970 edition of the U.S. Code, however, section 283 was only partially repealed by section 2 of Public Law 87-849, 76 Stat. 1119, 1126, and remained applicable to "retired officers of the armed forces of the United States." *Id.*

assisting in the prosecution of a claim against the United States involving the department in which he holds retired status.

Unlike 18 U.S.C. §§ 207 and 283, the conflict of interest provisions of S. 3308 would prevent representational activities only before the agency itself, not those rendered in court in connection with matters under the agency's jurisdiction, such as in judicial review of an agency order. We have no objection to this more limited scope of S. 3308. There is obviously a much greater potential for a former commissioner or member to use undue influence in administrative proceedings in which he is dealing directly with his former colleagues and subordinates than there is once the matter reaches court, where the case is subject to independent supervision by the court.

Also, we note the S. 3308 does not provide for criminal sanctions for former commissioners and members who violate its conflict of interest provisions. Presumably each agency will enforce the ban on representational activities by disqualifying the individual involved, either on its own motion or on the motion of a party to the administrative proceeding in which the former commissioner or member is appearing. This method of enforcement should be adequate. Because the ban extends only to services rendered before the agency, agency officials will be in a position to detect most if not all violations. For this reason, and because attorneys—the group at which this aspect of S. 3308 apparently is aimed[9]—would be required as a matter of professional ethics to comply with the ban, *see* ABA, Model Code of Professional Responsibility, DR Rule 2-110(B) (1976), the added deterrent effect of criminal sanctions does not appear to be necessary in order to accomplish the purposes of the statute.

## VIII. Accountability

Sections 11, 12(a), 13(g), and 14(a) of S. 3308 would amend the organic act of six of the agencies to provide that the Federal Tort Claims Act, 28 U.S.C. § 2680(a), (h) (1970 & Supp. V 1975), does not prohibit the bringing of a civil action against the United States based upon misrepresentation or deceit on the part of the agency or any of its employees or based upon any exercise or performance, or failure to exercise or perform, a discretionary function on the part of the agency or its employees which was grossly negligent.[10] Judgments would be paid out of general funds rather than out of funds appropriated for the operation of the respective agencies. Senate Report at 9.

---

[9] S. 3308 prohibits a former commissioner or member from representing a person before the agency "in a professional capacity." *See also* Senate Report at 8. The phrase "acts as agent or attorney," which appears in 18 U.S.C. §§ 207 and 283, is somewhat broader, covering informal contacts on behalf of others by the former employee in addition to those made in a professional capacity.

[10] The waiver of sovereign immunity in S. 3308 would apply only with respect to acts committed by the agencies or their employees prior to January 1, 1979, so that Congress may assess the impact of the waiver for discretionary acts before making it permanent. Senate Report at 9.

The sovereign immunity sections of S. 3308 are drawn almost verbatim from a provision that is already applicable to the CPSC. 15 U.S.C. § 2053(i) (as added by section 5 of the Consumer Product Safety Commission Improvements Act, 90 Stat. at 504). The Department of Justice apparently did not formally relay its views to Congress on that aspect of the CPSC legislation, but Assistant Attorney General Uhlmann did advise OMB by letter dated May 5 that the Department would support a veto of the bill (S. 644) because of the waiver of sovereign immunity and the expansion of the CPSC's litigating authority. The President approved the CPSC legislation without mentioning the Department's reservations. We assume that the Department will oppose an identical waiver of sovereign immunity for the other six agencies covered by S. 3308.

However, it should be noted that both the CPSC statute and the pertinent sections of S. 3308 contain two features which might serve to limit the scope of the waiver of sovereign immunity to some extent. First, there can be no recovery on a claim against the United States which is based on "agency action" as defined in 5 U.S.C. § 551(13) (1970)—i.e., "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." The purpose of the exception in the CPSC legislation was to eliminate the possibility that an action to recover damages under the Federal Tort Claims Act based on the performance of or failure to perform a discretionary act would be used as an alternative to seeking judicial review of the agency action under the Administrative Procedure Act. 121 Cong. Rec. 23,577–78 (July 18, 1975). We assume that the corresponding exceptions in S. 3308 have the same purpose. The effect of the qualification, however, will be to preclude liability for most major policy determinations which the discretionary act exception in the Federal Tort Claims Act, 28 U.S.C. § 2680(a), was designed to insulate from liability for damages. Presumably, this exception for agency action in S. 3308 will also apply to discretionary decisions and acts in the course of the administrative process which precede a final agency determination, not merely the formal agency action itself.

Second, the CPSC provision (15 U.S.C. § 2053(i) (as added by section 5 of the Consumer Product Safety Commission Improvements Act, 90 Stat. at 504)) and S. 3308 (§§ 11(a)(1), 11(b), 11(c)) both provide that a judgment may not be entered against the United States on a claim based upon the performance of or failure to perform a discretionary function "unless the court in which such action was brought determines (based upon consideration of all the relevant circumstances, including the statutory responsibility of the [agency] and the public interest in encouraging rather than inhibiting the exercise of discretion) that such exercise, performance, or failure to exercise or perform was unreasonable." As Assistant Attorney General Uhlmann pointed out in his May 5 letter to OMB on S. 644, this "reasonableness" test appears on its face to impose a standard of conduct on the agency and its personnel that is more lenient than and therefore inconsistent with the requirement, also contained in the CPSC legislation and S. 3308, that a claimant may not recover damages unless the discretionary conduct at issue was

"grossly negligent." However, the conference report on the CPSC legislation states that the court must find that the discretionary conduct was unreasonable "as a matter of law." H.R. Rep. No. 94-1022, at 18 (1976) (Conf. Rep.). This is the standard under tort law generally for taking an issue away from the jury, and it is ordinarily thought to be satisfied only when no reasonable person could reach a contrary conclusion. William L. Prosser, *Handbook of the Law of Torts* § 37, at 207 (4th ed. 1971). If Congress actually intends to impose such a stringent limitation on recoveries in addition to the separate requirement that the conduct be "grossly negligent," the waivers of sovereign immunity in S. 3308 may not result in many recoveries. But passage of this feature of the bill could nevertheless result in the filing of numerous and often frivolous damage claims by disgruntled persons or companies who have been only incidentally injured by a low level administrative decision or oversight. It is by no means clear that the cost and effort entailed in processing and defending all such claims is warranted in order to permit recovery in a few meritorious cases.

The CPSC provision which serves as a prototype for the sovereign immunity sections of S. 3308 was passed largely in response to a single incident involving the Marlin Toy Company that arose when the CPSC mistakenly included one of the company's products on a list of banned products. When Marlin requested that the list be corrected, the CPSC admitted its error but did not issue a retraction until it published a new list some eight months later. The company sustained a substantial financial loss as a result, but it could not recover until the Congress enacted special legislation enabling it to do so. *See* 121 Cong. Rec. 23,578 (July 18, 1975); 121 Cong. Rec. 33,686 (Oct. 22, 1975). We agree with the observation of Assistant Attorney General Uhlmann in his letter to OMB on S. 644 that the genuine hardship cases that have given rise to the sentiment in support of the CPSC provision, and presumably those in S. 3308 as well, are best dealt with by private relief legislation, as was in fact done in the Marlin Toy Company case.

For the foregoing reasons, we recommend that the Department oppose the adoption of the sovereign immunity sections of S. 3308. This could be justified on the ground that it is necessary to assess the impact of the special CPSC provision before extending the concept to other agencies.

MARY C. LAWTON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*